UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

LORIE LONGORIA,

        Plaintiff,

   v.                                                           Case No.14-C-1403

CAROLYN COLVIN,

        Defendant.

**DECISION AND ORDER**

Plaintiff filed this action challenging the decision of the Commissioner of Social Security denying her disability benefits. For the reasons given below, the decision of the Commissioner will be reversed and remanded for further proceedings.

**I. Background**

Plaintiff suffers from multiple sclerosis, which was diagnosed more than a decade ago, but which was not treated regularly. The ALJ considered the MS but found it did not result in significant motor function disabilities in two extremities, limitations on movements, or vision impairments. (R. 18.) The ALJ noted that the Plaintiff had received only limited and sporadic treatment relating to her MS, the last in 2011 and 2012, when her doctors found that she "generally feels well" and was "stable" on copaxone, a myelin-simulating drug that reduces the frequency of relapses in MS patients. (R. 282, 286.) The January 2, 2012 treatment note also indicated she had not had any severe flare-ups since beginning treatment with copaxone the previous July. (R. 285–89.)

The Plaintiff testified at her June 6, 2013 hearing that she had several flare-ups each week, at which times she could barely walk, but the ALJ discounted that testimony on the grounds that there were no medical records to confirm those symptoms, which appeared to be in contrast with the treatment notes suggesting that copaxone was preventing any severe flare-ups. (R. 21.) Her treating doctor noted in 2012 that she had experienced only two flare-ups, the most recent being two years prior. (R. 289.) Another record indicates about nine flare-ups in recent years. (R. 223.) The ALJ also noted there was no treatment from a neurologist, although he recognized that the Plaintiff's financial limitations appeared to be the main cause—she had no health insurance, and the local free clinic did not have a neurologist on staff. A physical exam in June 2011 showed strength in her extremities intact and she had no neurological deficits. (R. 224.) Although the Plaintiff experienced a flare-up in or around 2011, when her foot went numb after sitting on a couch, evidently that was not considered severe because the symptoms resolved after a few minutes. (R. 285.) She did, however, have chronic numbness in her right foot and "severe symptoms in her right leg." (R. 285-86.) This interfered with her sleep and caused her to stumble frequently. (R. 286.)

The Plaintiff also alleged disability due to back pain, presenting to her primary care provider on a number of occasions between 2005 and 2009. The ALJ noted that her MRI showed mild degenerative changes and accounted for any limitations by restricting her to light work with certain other limitations.

The Plaintiff also alleged mental health issues. She had been in special education programs in school, finishing only the eighth grade, and reported mood problems. Dr. Clarke preformed a consultative psychological evaluation and noted a significantly impaired visual memory,

questionable judgment and a poor fund of knowledge. (R. 257-59.) The psychologist noted that the Plaintiff spent most of her time with her mother, who lived in an apartment across the hall. She noted the Plaintiff's spotty work history, her stresses due to having no money or health insurance, and observed some depressive symptoms; she assessed a GAF score of 45, indicating serious impairments. The psychologist concluded the Plaintiff would be "slow" in her work, would have significant trouble remembering tasks, and could no longer perform the physical work she previously did, which included janitorial work. (R. 260.) The examiner also interviewed the Plaintiff's daughter, who painted a grimmer picture of Plaintiff's condition. She stated that the Plaintiff had trouble moving around, frequently needed to grip walls for support, and could not climb stairs. She believed that if the Plaintiff's mother did not cook most of their meals, the Plaintiff might never eat on her own.

State agency reviewers found that the Plaintiff retained the ability to do light, unskilled work. (R. 79.) She would have moderate difficulties maintaining attention and carrying out detailed instructions, maintaining regular attendance, performing on schedule, being punctual, and completing a normal workday. (R. 84.) Ultimately the ALJ found the Plaintiff could perform light work with certain restrictions, including being limited to simple routine, repetitive tasks involving only simple instructions, and with a job not requiring a production rate pace. (R. 20.)

**II. Analysis**

The decision of the Commissioner is conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g). The question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct

3

legal standard. *See Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003). The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart,* 362 F.3d 995 (7th Cir. 2004).

### A. Medical evidence

The Plaintiff's challenge is based largely on the ALJ's handling of the medical evidence. In 2013, Plaintiff's physician of fifteen years, Dr. Houlihan, filled out a questionnaire indicating that the Plaintiff experienced anxiety and depression, and would need as many as three unscheduled breaks, each lasting one or two hours, if she were forced to work a standard workday. (R. 378.) This was due primarily to the numbness Plaintiff chronically experienced in her right leg and foot. Dr. Houlihan also concluded she would be "off task" more than 25% in a workday due to distractions from her condition. (R. 379.) Plaintiff could experience three "good days" in a month, but would need to be absent from work more than four days a month. (R. 380.)

The ALJ discounted this opinion because "treatment records do not support such a level of restriction." (R. 21.) The ALJ noted that the most recent record indicated Plaintiff was doing well and was stable. The ALJ also noted that Dr. Houlihan opined that these limitations had existed since 2008, and yet the Plaintiff had worked in 2008 and 2009, which suggested the limitations could not have been that serious at that time. The ALJ also found that Dr. Houlihan's restrictions, which would have precluded gainful employment, were in contrast to the state agency reviewers, who found no disability.

The Plaintiff argues that the ALJ erred by failing to give adequate reasons for discounting the treating physician's opinion and failing to give the opinion controlling weight. Here, the ALJ

4

was not obligated to give the treating physician's opinion controlling weight. The ALJ reasonably explained that the rather harsh limitations found in Dr. Houlihan's 2013 form did not seem to reflect the Plaintiff's treatment notes, which told the story of a woman with MS who had occasional flare-ups but was otherwise doing "well" (at least sometimes) and was "stable" on her drug regimen. And the limitations imposed by Dr. Houlihan were contradicted by the reviewing physicians, who found the Plaintiff's alleged limitations to be "out of proportion w/ objective findings on exam. . .. [T]he clmt's statements about her symptoms and their functional effects [are] only partially credible." (R. 81, 275.) Thus, because there was evidence contradicting Dr. Houlihan's report, the ALJ properly did not find the report to be entitled to controlling weight. *Bauer v. Astrue,* 532 F.3d 606, 608 (7th Cir. 2008) ("There was evidence—the report of the nonexamining consultant—that contradicted the reports of the treating physicians. So the presumption [of controlling weight] falls out and the checklist comes into play.")

But the fact that the opinion need not have been deemed "controlling" does not mean it could be discounted or ignored. When the treating physician's opinion no longer is controlling, it becomes "just one more piece of evidence for the [ALJ] to weigh." *Hofslien v. Barnhart,* 439 F.3d 375, 376–77 (7th Cir.2006). Accordingly, he must evaluate the opinion's weight by considering the length, nature, and extent of the claimant's treatment relationships with her physicians, the degree to which the opinion is supported by evidence, the opinion's consistency with the record as a whole, whether the doctor is a specialist, and "other factors." 20 C.F.R. § 404.1527(c).

Here, the ALJ did not properly assess the weight to be given to the treating source's opinion using these factors. Although Dr. Houlihan's opinion might not have been entitled to "controlling" weight, it was a significant piece of evidence, given that it was based on a fifteen-year treatment

5

relationship with a medical doctor. Moreover, the ALJ's stated reasons for discounting the opinion seemed either irrelevant or to ignore other evidence that supported it. First, the ALJ noted that Dr. Houlihan had stated that the limitations he imposed had existed since "~ 2008," meaning approximately 2008. (R. 380.) The ALJ noted that the Plaintiff had worked in 2008 and 2009, and from that fact he surmised that the limitations Dr. Houlihan found did not exist at that time. There are several problems with this argument. First, even if Dr. Houlihan was wrong about the onset date of the limitations, it is largely irrelevant. Supposing the physician erred in believing that the limitations existed in about 2008, that does not mean he was wrong that they existed in 2009, 2010 or 2011. Plaintiff's alleged onset date is January 1, 2011, and so clearly Dr. Houlihan believed the symptoms existed by then, which is what is of primary importance. Second, Dr. Houlihan was obviously estimating the onset date, since he took the trouble to write "~ 2008" instead of just 2008, or something more specific like February 2008. Given that the form was filled out five years later, it would not be surprising if Dr. Houlihan were a year or two off. Finally, it is well-recognized that sometimes people go above and beyond reasonable tolerances for pain in order to pay bills. Thus, the fact that she might have worked in 2008 or 2009 does not necessarily undercut her disability at that time.

A second reason the ALJ gave for discounting Dr. Houlihan's opinion ignores other evidence in th e record. The ALJ cited treatment notes indicating that Plaintiff "generally feels well" and was "stable." (R. 282, 286.) The comment that she "feels well" was made in the context of a visit to Catherine MacMillan, D.O. for complaints relating to a urinary tract infection. (R. 282-84.) The record contains evidence from both Dr. Houlihan and Dr. Clarke, the consulting examiner, that the Plaintiff's MS produces good and bad days. For example, during her exam with Dr. Clarke,

6

the Plaintiff was not grasping at walls for support, nor was she using a cane. But this was because the Plaintiff was having a good day. (R. 256, 57.) Multiple sclerosis is a disease of relapsing and remitting, of flare-ups, of good days and bad ones, as reflected in Dr. Houlihan's notes and disability report, in which he opines that Plaintiff would miss four or more days of work per month and that she would experience "~ 3 good days" per month . (R. 380.) Given this background, it seems unreasonable to rely on a single treatment note from a visit for a urinary tract infection as evidence that would trump the four-page disability report prepared a year later by Plaintiff's physician of fifteen years.

Similarly, the fact that the Plaintiff was "stable" on her MS drug does not mean she was doing well. *Murphy v. Colvin,* 759 F.3d 811, 819 (7th Cir. 2014) (noting that "stable" could apply to any condition that was neither improving nor worsening.) It appears that in this context "stable" meant Dr. Houlihan believed the drug was helping prevent severe flare-ups, but nevertheless the Plaintiff had chronic numbness in her right foot and the other neurological problems noted in the record, such as headaches and intermittent vision loss. After all, it was Dr. Houlihan who indicated that she was "stable" in 2012 (R. 286) and who later indicated, the next year, that she was essentially unemployable. The opinion of stability is not incompatible with the conclusion that she was severely limited in her ability to work, and so it is unclear why the ALJ would have concluded that "stable" treatment note (without more) should undercut the much more detailed medical source statement Dr. Houlihan filled out in 2013.

In addition, the ALJ appeared to discount Dr. Houlihan's 2013 opinion because it was "unclear" whether Dr. Houlihan had even seen the Plaintiff during the year leading up to his 2013 disability report. (R. 21.) But, as the Plaintiff notes, that is largely speculative. In fact, she notes,

she has received new medication since 2012, and so she must have visited Dr. Houlihan at some point. The form itself recites that Dr. Houlihan had been seeing Plaintiff two to three times per year for fifteen years. (R. 377.)

Finally, the ALJ discounted Dr. Houlihan's opinion as to Plaintiff's mental health issues because Dr. Houlihan was a general practitioner rather than a mental health expert. (R. 19.) Mental health treatment, including prescription drugs, is very frequently provided by primary care physicians. *Gillim v. Colvin,* 2013 WL 1901630, at *7 (N.D. Ill. May 7, 2013) ("[a]lthough the ALJ also discounted plaintiff's mental health treatment on the ground that she received psychotropic medications through her primary care provider rather than from a mental health specialist, courts have recognized that most psychiatric impairments are diagnosed and treated by primary care physicians, and there is no statutory or regulatory requirement that such treatment be provided by a psychiatrist or psychologist."). This is particularly true when the evidence shows that a claimant has no health insurance and no way to obtain treatment from specialists like psychiatrists.

The fact that Dr. Houlihan was not a specialist is particularly unpersuasive in this case, given the corroborating opinion of the consulting psychologist, who *is* a mental health specialist. Dr. Clarke's report was not optimistic about Plaintiff's abilities or her ability to work. *Walters v. Astrue,* 444 F. App'x 913, 920 (7th Cir. 2011) ("If accepted, a GAF of 45 suggests that Walters may be unable to work.") The ALJ did not discuss the GAF score of 45, nor did he engage in a detailed assessment of Dr. Clarke's examination. Instead, the ALJ repeatedly noted that the Plaintiff had never received mental health treatment, a fact which can be attributed to her lack of insurance and money rather than an absence of any genuine mental health conditions. The ALJ also rejected Dr. Clark's opinion because it was in part based on physical limitations for which Dr. Clark had no

expertise. (R. 18.) But unless offered as a basis for assessing Dr. Clark's credibility, this is a reason for rejecting only that part of her opinion that was based on physical limitations, not the entire opinion. Dr. Clarke had made detailed findings based on tests she administered that the Plaintiff would be "slow" in concentration, attention and work pace, would be unable to handle stress, and would have difficulty performing the physical jobs she'd had in the past. (R. 260.) Her fund of knowledge was very low: the Plaintiff did not know any of the four states that surround Wisconsin, did not know who the governor was, and had no knowledge about multiple sclerosis. (R. 257.) Dr. Clarke's conclusion of serious limitations essentially echoes Dr. Houlihan's conclusion that Plaintiff's attention and concentration would require her to be off-task 25% or more of the time, and that she would be unable to handle stress "due to underlying anxiety." (R. 380.)

Finally, the ALJ did not appear to give any weight to the quite lengthy relationship between the Plaintiff and Dr. Houlihan. In some cases, of course, a close patient-physician relationship could skew the physician's conclusions towards helping his patient obtain disability. Here, there is no indication of that. The regulations require consideration of the extent of the relationship: "Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source." 42 C.F.R. § 404.1527(c)(2)(i). Here, rather than giving the opinion of a long-time physician "more weight," the ALJ appears to have gone out of his way to favor the opinions of the non-treating reviewers who did not have the benefit of Dr. Houlihan's opinion when they issued their own.

9

In sum, the opinions of the two medical sources who treated or at least saw Plaintiff suggest serious difficulties in her ability to work. Although the ALJ was not obligated to give Dr. Houlihan's opinion controlling weight, the opinion was entitled to significant weight, particularly as it was consistent with Dr. Clarke's opinion. The ALJ and state agency reviewers appeared to base their non-disability conclusions on the absence of other treatment notes suggestive of such serious limitations (R. 81), but where that absence is likely due to the Plaintiff's inability to obtain additional medical treatment, as well as her mental limitations, which seems to have clouded her realization that MS was a very serious illness, more is required, especially where the records that do exist support a finding of disability.

**B. RFC**

Plaintiff also argues that the ALJ erred in formulating her RFC by failing to include in the RFC limitations noted by the state reviewing consultants whose opinions the ALJ gave the greatest weight. It is well established that when an ALJ poses a hypothetical question to a vocational expert, the question must include all limitations supported by the medical evidence. Here, the ALJ found that Plaintiff had moderate difficulties with persistence, concentration or pace at steps 2 and 3 of the sequential process used by the SSA to determine disability claims. (R. 19.) State consultant, Psychologist Kyla King, found that Plaintiff was moderately limited in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance, and be punctual within customary tolerances; completing a normal workday and workweek without interruptions from psychologically based symptoms; and performing at a consistent pace without an unreasonable number and length of rest periods. (R. 83–4.) The ALJ failed to discuss these limitations or explain why they were not

included in the RFC he found or the hypothetical question the ALJ posed to the VE. The ALJ limited Plaintiff to "simple routine, repetitive tasks, requiring only simple work related decisions and few changes in the work setting. " (R. 20.) The ALJ also stated Plaintiff was "unable to perform at production rate pace but can perform goal oriented work." (Id.)

The RFC and hypothetical formulated by the ALJ does not account for all of the moderate limitations. Under similar circumstances, the Seventh Circuit has continued to remand cases to the ALJ for an insufficient RFC: "[W]e have repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." *Yurt v. Colvin*, 758 F.3d 850, 858 (7th Cir. 2015). Here, the state consultant opined that claimant "appears capable of performing basic abilities of unskilled work." (R. 84.) But this does not account for the moderate difficulties the consultant concluded Plaintiff would have in maintain regular attendance, and be punctual within customary tolerances; completing a normal workday and workweek without interruptions from psychologically based symptoms. On remand, the ALJ should either include this limitation in the RFC or explain why it is rejected.

**III. Conclusion**

For the reasons given above, the decision of the Commissioner is reversed, and the case is remanded to the Commissioner. The clerk will enter judgment accordingly.

**SO ORDERED** this 29th day of January, 2016.

                                              /s William C. Griesbach  
                                              William C. Griesbach, Chief Judge  
                                              United States District Court